**FILED
CLERK**

8/19/2016 3:34 pm

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
TRACEY SANDLER,

                        Plaintiff,

              -against-

JOSEPH BENDEN, BAYVIEW MANOR LLC d/b/a
SOUTH POINT PLAZA NURSING AND
REHABILITATION CENTER, ILENE L.
NATHANSON, PAMELA BRODLIEB, and
LONG ISLAND UNIVERSITY,

                       Defendants.
-------------------------------------------------------------------X

ORDER
15-CV-1193(SJF)(AKT)

FEUERSTEIN, District Judge:

## I.      Introduction

On March 8, 2015, plaintiff Tracey Sandler ("plaintiff") commenced this action against

defendants Joseph Benden ("Benden") and Bayview Manor LLC d/b/a South Point Plaza Nursing

and Rehabilitation Center ("South Point") (collectively, "the Bayview defendants"), and

defendants Ilene L. Nathanson ("Nathanson"), Pamela Brodlieb ("Brodlieb"), and Long Island

University ("LIU") (collectively, "the LIU defendants"), seeking damages for, *inter alia*,

defendants' alleged unjust enrichment, breach of contract, breach of fiduciary duty, defamation,

fraud, tortious interference with contract and violations of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. §§ 201, *et seq.*; Articles 6, 19 and 20-C of the New York State Labor Law

("NYLL"); the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; the

Rehabilitation Act, 29 U.S.C. §§ 701, *et seq.*; the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.*; Article 23-A of the New York Corrections Law;

and Chapter XXI, Title C2 of the Nassau County Administrative Code ("the Nassau County

Code").  Pending before the Court are the motions of the Bayview defendants and the LIU

defendants (collectively, "defendants") for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure.  For the reasons set forth below, defendants' motions are

granted to the extent set forth herein.


II.     Background

        A.      Factual Allegations[1]

        Plaintiff "has a criminal history . . . for acts performed nearly two decades ago[,]"

(Amended Complaint ["Am. Compl."], ¶ 19), and was issued a Certificate of Good Conduct by

the New York State Board of Parole on or about September 4, 2007.  (*Id.*, ¶ 19; the Bayview

defendants' Answer to the Amended Complaint ["Bayview Ans."], ¶ 19).  Plaintiff claims that

she has the following disabilities as a result of two (2) car accidents in which she was involved in

2008 and 2010: "bulging and herniated disks, nerve damage and post traumatic stress disorder

[PTSD]."  (Am. Compl., ¶ 17).  According to plaintiff, as a result of those disabilities "[s]he is

limited in her ability to sit, stand or walk for long periods without experiencing pain, in

performing manual tasks, . . . in her ability to lift and bend[,] . . . [and] in her ability to

concentrate under circumstances which trigger [PTSD], such as driving in hazardous

conditions[,] [but] [s]he was and is able to perform all functions of a student, a social worker and

social work intern with, at most, minor accommodations."  (*Id.*; *see also id.*, ¶¶ 104, 110, 116,

---

[1]  The factual allegations in the complaint are assumed to be true for purposes of this
motion and do not constitute findings of fact by the Court.

122).

At all relevant times, plaintiff was enrolled as a part-time student in LIU's Masters of Social Work ("MSW") program ("the Program" or "the MSW Program").  (Am. Compl., ¶¶ 2, 17, 24; the LIU defendants' Answer to the Amended Complaint ["LIU Ans."], ¶¶ 2, 24; Bayview Ans., ¶ 17).  As part of the Program, plaintiff "was assigned to a field practicum," (LIU Ans., ¶ 2)[2], *i.e.*, she performed an unpaid internship, at South Point from September 2013 until March 10, 2014.  (Am. Compl., ¶¶ 2, 17, 37, 49; Bayview Ans., ¶¶ 2, 17, 49).  According to plaintiff, LIU "promised," *inter alia*, that the unpaid internships "would provide education and training in social work for each student, including [her][,] . . . and provided school credit to students for its completion, such credit being a requirement for graduation." (Am. Compl., ¶ 25).

Nathanson is a licensed social worker and, at all relevant times, was the chairwoman and director of LIU's Social Work Department.  (Am. Compl., ¶ 22; LIU Ans., ¶ 22).  According to plaintiff, Nathanson, *inter alia*, was "responsible for all decisions made within the department regarding enrollment, placement, expulsion, grading, internships, hiring, firing, pay, and employment[;] . . . [and] supervised, directed and instructed all professors in the social work department including those who taught [plaintiff]."  (Am. Compl., ¶ 22).

Brodlieb is a social worker and, at all relevant times, was the director of field education

---

[2]  According to the LIU defendants, "the second-year curriculum requires a field education component[.]" (LIU Ans., ¶ 25).  Pursuant to LIU's Field Instruction Manual for the Program, the terms and effect of which the amended complaint "relies heavily," (*see* Am. Compl., ¶¶ 26, 28-29, 31-33, 45-47, 58-59, 60-62), and which is, thus, rendered "integral" to the complaint, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002), second-year students "are required to complete a total of 300 hours [in the field] during each of the standard Fall and Spring semesters."  (Affirmation of Catherine Murphy in Support of the LIU defendants' motion ["Murphy Aff."], Ex. E at 17).

for the Program at LIU.  (Am. Compl., ¶ 23; LIU Ans., ¶ 23).  Pursuant to the Field Instruction Manual, the field director was responsible for, *inter alia*: (1) visiting, interviewing, recruiting and processing new agencies as potential field sites; (2) interviewing, advising and providing students with possible agency choices; (3) matching and overseeing placement of the students in agencies; (4) providing "student orientation in conjunction with faculty to discuss . . . task assignments, process recordings, other expectations in the field and the field course outline[;]" (5) responding to field problems and issues of an administrative nature; (6) monitoring placements "to assure compliance with program and field competencies, policies and procedures[;]" (7) changing "placements only when absolutely necessary and in consultation with faculty liaison and agency field instructor[;]" (8) overseeing the field liaisons; and (9) disseminating, collecting and maintaining all evaluations in files, including the field instructor's evaluations of the student and the Program, the student's evaluation of the placement and the field liaison's evaluation of the field site.  (Murphy Aff., Ex. E at 6-7).

Pursuant to the Field Instruction Manual, the field liaison "is assigned a maximum of 15 students per semester[,]" (Murphy Aff., Ex. E at 7), and is responsible, *inter alia*, for keeping "regular contacts" with the student and field supervisor; monitoring the student's workload, assignments and progress in the field through written task sheets and written evaluations from field instructors; and responding to and attempting to resolve field problems and issues between students and field instructors or other agency personnel.  (*Id.* at 7-8; *see also* Am. Compl., ¶¶ 60-61).

Plaintiff alleges, *inter alia*, that "[p]er LIU's student handbooks, LIU is required to locate and vet such internships for its students, and provide its students with contact information for the

4

chosen facility(ies) [sic].  Students then apply for such internships."  (Am. Compl., ¶ 26; *see also*

*id.*, ¶ 28).  Pursuant to the Field Instruction Manual,

> "Generally, once a potential field site becomes known to the program, the agency is expected to provide written information on their programs, completing an agency data base form and experience outline for all potential field instructors.  If the agency is interested in serving as a field site, it must specify the learning experiences available to students and the qualification of the personnel available to supervise students.  In addition, if the agency is new to hosting MSW interns, the agency must pass a 'site evaluation' that is conducted by the Field Director. . . .

> Specifically, the Field Director looks for agencies whose programs have competent staff to provide effective supervision and professional learning; a commitment to social work ethics, values, social justice, and training of social work professionals, and a mission that includes service to diverse populations and populations at risk.  In addition, students must be able to employ a broad range of technologies and modalities, consonant with both generalist and specialist practice at the field site. . . ."

(Murphy Aff., Ex. E at 9; *see also* Am. Compl., ¶¶ 28-29, 33).  The Field Instruction Manual sets

forth certain criteria for selecting field sites, including: "[c]learly defined services, whose mission

and values are compatible with Social Work[;]" "[w]illingness to provide for the duration of the

placement a qualified field instructor with adequate time to carry out expected educational

tasks[;]" "[p]rovision of appropriate learning experiences for students including direct service

work assignments, participating in staff conferences, training, and seminars which complement

and supplement the goals of generalist and/or specialist practice[;]" "[a]vailable work space and

resources for the student to carry out the professional role[;]" "[w]illingness to cooperate and

participate with the Program in the development, monitoring and review of a well-integrated

generalist/specialist curriculum[;]" and "[f]lexibility in providing the field instructor with

adequate time to provide supervision and guidance to the student, as well as to review process

recordings, prepare written evaluations, confer with the field liaison and attend, if possible, orientation and Advisory Committee meetings at the school."  (Murphy Aff., Ex. E at 9; *see also* Am. Compl., ¶ 28).

Pursuant to the Field Instruction Manual, "[p]rior to the commencement of field, all students are required to attend a Field Orientation, at which field instruction policies and procedures are outlined[,]" (Murphy Aff., Ex. E at 13; *see also* Am. Compl., ¶ 45), and "[o]nce field instruction begins, students are encouraged to problem solve any issues in the field with their liaisons."  (Murphy Aff., Ex. E at 13).

The Field Instruction Manual provides that the first semester of field instruction should include, *inter alia*, the following activities and assignments: (1) "[a]n orientation to the agency, its mission, programs, policies, safety procedures, staff, resources and geographic and professional community of the agency[;]" (2) "[e]xposure to and inclusion in professional/staff meetings, seminars, task forces, committees, educational workshops, and training[;]" (3) [p]rovision of 1 ½ hours of regularly scheduled weekly supervision that includes discussion of agency functions, process recordings, values and ethics, the integration of theory with practice, the formulation, monitoring and evaluation of learning goals, and role playing client-worker scenarios whenever possible[;]" and (4) "[p]rovision of varied opportunities to observe the social workers ethically engaging, assessing, contracting, and/or working with client systems of various types and sizes, . . . [and] to[] utilize the problem-solving process[,] develop communication and relationship-building skills[,]" etc. (Murphy Aff., Ex. E at 21-22; *see also* Am. Compl., ¶¶ 45-46).

In addition, the Field Instruction Manual provides, in relevant part:

6

"Overall, the professional development of students is the responsibility of all faculty members.  Faculty are committed and obligated to assist students with any academic or field difficulties. . . . In the field, a student who is having difficulties is instructed to first try to resolve the situation with the field instructor.  If unable to resolve the problem directly with the field instructor, the student should bring the matter to the attention of his or her Field Liaison.  The Field Liaison may involve the Field Director if the problem persists.  Depending on the nature of the situation, the student may be granted the option to change field placements if it is found that there is a problem with the field instructor or agency.  However, if the problem is found to be within the student, then a corrective plan of action is devised for the student.  If continued problems exist, whether it is on the part of the student or field instructor, the problem would be brought before the Grievance & Appeals Committee ["GAC"].

. . .

The [GAC] is comprised of 4 graduate faculty members representing both the LIU Post and Brooklyn Campuses.  The structure of this committee provides objectivity in view of the student's situation.  The [GAC's] purpose is to arbitrate student grievances and appeals and attempt to resolve any conflicts between students and faculty that require mediation.  An ***appeal*** refers exclusively to situations regarding student's perception of unfair grading practices.  A ***grievance*** refers to a situation regarding the student's perception of discriminatory treatment."

(Murphy Aff., Ex. E at 34-35; *see also* Am. Compl., ¶¶ 58, 62) (emphasis in original).  If the student is not satisfied with the GAC's decision on either an appeal or a grievance, he or she can appeal that decision to the Dean of the School of Health Professions and Nursing.  (Murphy Aff., Ex. E at 37-38).  The Dean's decision may be appealed to the Office of the Vice President of Academic Affairs.  (*Id.* at 38).

During the Fall 2013 semester, LIU provided plaintiff "with one 'choice' in internships," *i.e.*, South Point.  (Am. Compl., ¶ 27).  Before providing plaintiff with that internship, Nathanson allegedly asked her, "pursuant to her criminal history, 'If you didn't have a conscience then, what makes you think you have one now?'"  (*Id.*, ¶ 35).  In addition, Nathanson purportedly

7

commented: "Based on your . . . criminal record I don't know where we'll ever find you

placement [at an internship].'" (*Id.*)

Plaintiff alleges that "Nathanson had also protested [her] need for a minor disability-

based accommodation regarding classroom study – [her] physician had noted in writing that [she]

required a 10-minute break to stretch and walk after sitting in class continually for 1 ½ hours[,] . .

. [which] amounted to one short break per three-hour class[.]" (Am. Compl., ¶ 36).  According to

plaintiff, "Nathanson went so far as to call a meeting with LIU's Disabilities Support Services

office to express her disapproval."  (*Id.*).

Plaintiff applied for the internship at South Point by completing a "lengthy" application

"in which she noted her criminal history and disabilities[.]" (Am. Compl., ¶ 37; *see also id.*, ¶

20).  "At South Point, [plaintiff] was never supplied with notice regarding her regular hourly rate

of pay, overtime rate, pay day, method of pay calculation, name and address of employer and

other information[;] was not required to provide written confirmation of receipt of such notice[;]

and was never provided with a wage statement[.]" (*Id.*, ¶ 48; Bayview Ans., ¶ 48).  According to

the Bayview defendants, "as an unpaid student intern, [p]laintiff was not an employee of [South

Point] and thus [it] was not obligated to provide such notice."  (Bayview Ans., ¶ 48).

At all relevant times, Benden was the administrator of South Point. (Am. Compl., ¶ 20;

Bayview Ans., ¶ 20).  According to plaintiff, Benden, *inter alia*, "had power over personnel

decisions at South Point, interns, hiring and firing, setting and paying wages, establishing work

schedules and duties, and maintaining records[,]" (Am. Compl., ¶ 20); and supervised her during

her internship at South Point.  (*Id.*, ¶¶ 2, 20).

Plaintiff interned at South Point for approximately sixteen (16) hours per week from

September through mid-December 2013, and approximately seventeen (17) hours per week from mid-January until on or about March 10, 2014.  (Am. Compl., ¶ 49)  On or about September 26, 2013, plaintiff executed a "Three-Party Field Contract" ("Field Contract") between herself, South Point and LIU, providing, *inter alia*, that South Point agreed (1) to "[p]rovide an experienced MSW level field instructor, who has completed the required Seminar in Field Instruction Training and is committed to educating students for social work practice[,]" (Field Contract at 2, ¶ 2; *see also* Am. Compl., ¶ 50; Bayview Ans., ¶ 50); (2) to "[a]ssign at least one case by the second week of placement and increase the load at a pace which keeps the student challenged but not overwhelmed," and to make such assignments "with educational value as the primary consideration, appropriate to the level and skill of the student[,]" (Field Contract at 2, ¶ 3; *see also* Am. Compl., ¶ 51; Bayview Ans., ¶ 51); (3) to "[p]rovide a minimum of one to one and a half hours of supervision at a regularly scheduled, mutually agreed upon time[,]" (Field Contract at 3, ¶ 7; *see also* Am. Compl., ¶ 52; Bayview Ans., ¶ 52); and (4) to "[v]ary assignments to include clients from different cultural, social, and religious backgrounds and call for different helping roles: i.e., counseling, advocacy, brokerage, outreach, etc.[,]" and "[w]here possible, [to] include work with individuals, groups, families and communities."  (Field Contract at 3, ¶ 9; *see also* Am. Compl., ¶ 53; Bayview Ans., ¶ 53)  According to plaintiff, "[f]or a good deal of [her] internship," she was not provided with an experienced MSW level field instructor, (Am. Compl., ¶ 50); she was not assigned "at least one case by the second week of placement[,]" (*id.*, ¶ 51); "[n]early no . . . supervision was provided during the entire internship[,]" (*id.*, ¶ 52); and she "had no clients at all except for one, who started very late in her first semester, and a sole, ill-fated group meeting in her second semester."  (*Id.*, ¶ 53)

9

Plaintiff alleges, *inter alia*, (1) that "Brodlieb and LIU failed to properly vet South Point by failing to carry out all or substantially all of its required and promised vetting procedures, resulting in [her] placement in a worthless internship in which [she] received nearly no training in social work, and was subjected to an unethical, dishonest, discriminatory and unsafe environment[,]" (Am. Compl., ¶ 38); (2) that she received "very little," "few" and/or "nearly no" educational or training benefits from the internship, (*id.*, ¶¶ 2, 39, 49), "as it consisted primarily of secretarial and receptionist duties such as filing, photocopying, fetching food, organizing paperwork and making and receiving ordinary phone calls[,]" (*id.*, ¶ 2; *see also id.*, ¶¶ 39, 49), and "grunt work," including "wheeling patients, running errands, . . . making phone calls to patients' families to arrange for basic patient maintenance, finding clothes for patients, ordering from catalogs, relaying messages to patients, etc.," (*id.*, ¶ 49); (3) that "LIU, knowing of [her] old criminal record, . . . intentionally placed [her] at an educationally-useless internship[] . . . at a facility which had recently been cited for numerous deficiencies and was under investigation by the New York State Department of Health[,]" (*id.*, ¶ 3; *see also id.*, ¶ 44); (4) that LIU failed to provide her with the field orientation, guidelines and "varied opportunities" promised in its student handbook, (*id.*, ¶¶ 45-47); (5) that she "received nearly none of th[e] supervision" promised in LIU's student handbook, (*id.*, ¶ 45; *see also id.*, ¶ 49); (6) that the field liaison to which she was assigned (a) was assigned "significantly more" students that the fifteen (15)-student maximum, and (b) failed to keep in regular contact with her and her field supervisor and to monitor her workload, assignments and progress in the field, (*id.*, ¶ 61); and (7) that "the ratio of students to full time faculty [at LIU] was significantly higher" than the 1:12 ratio LIU was required to maintain.  (*Id.*).

10

According to plaintiff, "[h]ad Brodlieb conducted, or properly conducted, the promised 'field evaluation,' she would have observed that, past the first floor, which includes the floor on which [plaintiff's] office was located, hallways were nearly always covered in urine and/or feces, deposited there by residents of the facility, which would remain for long periods of time with no indicating signs, as South Point failed to hire adequate janitorial staff[,] . . . constitut[ing] both a health and slipping hazard and plac[ing] [her] in daily danger, contrary to LIU's promise that students would 'never be placed' in danger." (*Id.*, ¶ 40).  In addition, "an extremely high percentage of the residents of South Point were infected with Hepatitis B, presenting such a danger to [plaintiff] that she had herself vaccinated[,]" (*id.*, ¶ 41); and there was an "ever-present" danger to plaintiff because, although she was never assaulted, "it was not uncommon for certain residents in the population to become violent." (*Id.*, ¶ 42).  According to plaintiff, "during much of the internship, [she] was not permitted to leave the tiny office into which she had been placed, even to go to the bathroom – Benden would call her and instruct her not to leave the office because the New York State Department of Health was on the premises performing an investigation into alleged health violations by South Point, and [he] did not want [her] to speak with them." (*Id.*, ¶ 49).

Plaintiff alleges that "[n]o other student interned with [her], none had ever interned at [South Point] before, other than one who, upon information and belief, had a poor experience there[3], and upon information and belief, no LIU student has interned there since." (*Id.*)

Plaintiff alleges, *inter alia*, that Benden, (1) "criticized and insulted [her] for her lack of

_____

[3]  Plaintiff also contradictorily alleges that "LIU had never before placed any student at South Point for an internship."  (Am. Compl., ¶ 44).

ability to perform physical labor due to her disability, such as pushing patients in their wheelchairs or bending down to plug in a computer, functions which are not properly assignable to a social worker in the first place, but rather to a nurse or an aide[,]" (Am. Compl., ¶ 54); (2) "would often say things such as, 'What good are you, you can't do anything,' or 'You'll never amount to anything [because of your disabilities][,]'" (*id.*) (brackets in original); (3) denied her "the 10-minute breaks to walk and stretch after every hour and a half of continuous sitting, which her doctor had specified in writing that she needed, denied [her] a lunch break, and denied [her] request to work three shorter days rather than two longer ones[,]" (*id.*, ¶ 55); (4) commented "that interns did not receive 'special treatment' in his day, and that accordingly, [plaintiff] should not be treated differently than he had been, despite her disabilities[,]" (*id.*); (5) "forced [her] to work in an office so tiny that, although she could stand up from her desk, there was no room to walk or stretch sufficiently to prevent and/or alleviate disability-related pain[,]" (*id.*); and (6) "chastised [her] and complained to LIU regarding [her] few absences during blizzards . . . , although he was fully aware that [she] suffered from [PTSD] as a result of the two car accidents in which [she] had been involved, and which condition he knew was triggered by driving in hazardous weather conditions." (*Id.*, ¶ 56).

According to plaintiff, (1) she complained "throughout the fall semester to Benden about his verbal abuse and lack of accommodations, to no avail[,]" (Am. Compl., ¶ 55); (2) she complained to Brodlieb about Benden's purported "verbal abuse, refusal to provide accommodations, and lack of supervision and training, and requested a change of internships, . . . [but she] was consistently and repeatedly refused assistance[,]" (*id.*, ¶ 57); and (3) she also "complained to her 'field liaison,' . . . [but] th[o]se complaints fell on deaf ears also." (*Id.*, ¶ 60).

12

In or about December 2013, "after it became clear that . . . Brodlieb and the field liaison would not help, [plaintiff] complained of the hostile work environment and refusal to accommodate to LIU's Disability Support Services ["DSS"] office, which finally forced South Point and Benden to at least provide the needed accommodations."  (*Id.*, ¶ 63).

Following the "intervention" by LIU's DSS, Benden's purported abuse of plaintiff increased and "his harassing comments became more severe and even more frequent."  (Am. Compl., ¶ 64).  "During the spring semester [Benden] would frequently chastise [plaintiff] for her request to spread her work over three days, saying that 'everyone else' spread it out over only two, and that the three days was 'unacceptable in [his] . . . book.'" (*Id.*)  In addition, Benden (1) commented, *inter alia*, that plaintiff "would never amount to anything," "would never get a job," "should have remained a cab driver," and "should have stayed in jail," (*id.*); and (2) sent plaintiff "to work for the billing department to perform work which bore no resemblance to social work whatsoever."  (*Id.*)  According to plaintiff, she "continued to complain to Brodlieb and her field liaison regarding the hostile work environment and lack of supervision and training at South Point and continued to request a change of internship, but still assistance was refused."  (Am. Compl., ¶ 65).

On or about February 28, 2014, plaintiff submitted a "process recording" to Benden and LIU "disclos[ing] improper quality of patient care at South Point, specifically in regard to an incident in which the social work director at South Point, . . . had disrupted a group meeting with residents by noisily arriving late with an inappropriate patient (who in turn disrupted the meeting), and failed to introduce herself to patients who were discussing personal life circumstances who did not know who she was, and then publicly contradicted [plaintiff] by

providing inaccurate, misleading information to the group." (Am. Compl., ¶ 67). Plaintiff

reported that the director of social work purportedly violated certain rules of ethics by "later bad-

mouth[ing]" plaintiff and "telling a non-social worker the details of the life situation of a patient

in the group meeting." (*Id.*)

According to plaintiff, "[w]ithin days, if not hours, of reading the process recording, in a

letter dated March 10, 2014, Benden made several discriminatory, retaliatory, untrue and

defamatory statements regarding [her] . . . [and] published th[e] letter to Brodlieb and LIU[,] . . .

[who] immediately republished [it] to Nathanson and other faculty and staff at LIU." (Am.

Compl., ¶ 68). The alleged defamatory statements include, *inter alia*: (1) that plaintiff's

"attendance continue[d] to be an issue[,]" (*id.*, ¶ 68); (2) that Benden "requested and [plaintiff]

agreed [to] check in with [him] when she arrive[d] at [South Point] so [he] [could] update her on

pertinent information and . . . monitor her attendance[,] . . . [but] she ha[d] not done so[,]" (*id.*, ¶

69); (3) that Benden "asked and [plaintiff] agreed that she write progress notes on the residents

she sees and give[] them to [him] to sign off on and discuss[,] . . . [but] she ha[d] not done so[,]"

(*id.*, ¶ 70); (4) that when Benden asked plaintiff about the failure to give him progress notes, "she

reported she gave them to another Social Worker to read and sign off on and then she put them in

the chart[,] . . . [and] she does not remember who the people are she wrote th[o]se notes on[,]"

(*id.*); (5) that on March 5, 2014, plaintiff "either signed out and then went back upstairs and

continued working or she falsified her attendance sheet[,] [and] [e]ither action is unacceptable[,]"

(*id.*, ¶ 71); (6) that plaintiff "was observed by the Director of Social Work giving residents false

information in the group she was running[,] [and] [w]hen the Director of Social Work intervened

and tried to clarify the information [plaintiff] became very defensive and stated the Director of

14

Social Work was interrupting her group[,]" (*id.*, ¶ 72); (7) that plaintiff "has clearly demonstrated an inability to complete the most basic tasks that are required for [Benden] to supervise an intern and for [South Point] to have an intern conduct their field placement effectively[,]" and although he "spoke[] to [plaintiff] on several occasions about what is expected and she agreed[,] [she] ha[d] not followed through[,]" (*id.*, ¶ 73); and (8) that "[w]hen issues are discussed, [plaintiff] says she only comes to field placement 'because it's better than sitting home on my ass' and other remarks which demonstrate her lack of interest and a sense of hostility toward her field placement."  (*Id.*, ¶ 74).  "Benden ended the letter with a request that [plaintiff] be removed from her placement at South Point."  (*Id.*, ¶ 76).

According to plaintiff, Benden's assertions in the letter were "untrue," "misleading" and/or "defamatory" and "written willfully and maliciously, with actual malice and with intent to injure and damage [her] good name and reputation as a student, intern, and future social work, and . . . to encourage her expulsion from the social work program."  (Am. Compl., ¶¶ 68-74). Plaintiff alleges: (1) that "Benden knew that [she] missed time only during blizzards during which the school was closed, and on two occasions on which her physician informed her that she was contagious and should not expose the vulnerable population at South Point to her illness[,]" (*id.*, ¶ 68); (2) that she "always made up any lost time[,]" (*id.*); (3) that "Benden was aware that [she] suffered from [PTSD] related to driving, . . . and that such PTSD was triggered by driving in blizzards[,]" (*id.*); (4) that Benden had only requested that she check in with him when she arrived at South Point and to give him progress notes on the residents she saw in or about the beginning of February 2014, and she attempted to comply with those agreements for approximately one week, but each time Benden was unavailable to meet with her, then he left on

vacation and returned "only shortly prior to [her] termination" from the Program, (*id.*, ¶¶ 69-70); (5) that "after being unable to meet with Benden, [she] resourcefully provided the [progress] notes to . . . [another] social worker . . . who reviewed them and instructed [her] to place them in the client's file, not to provide them to Benden[,]" (*id.*, ¶ 70); (6) that she never informed Benden that she did not know "the identity of the client for whom she had prepared the [progress] notes[,]" (*id.*); (7) that she "was never asked to not work beyond 5:00 p.m. until March 7, 2014, making it impossible for her to have violated any such directive on March 5, 2014, . . . and [d]uring this period of her internship, [she] consistently left . . . at 5:00 p.m[,]" (*id.*, ¶ 71); (8) that she "gave residents completely accurate information which was based on a specific inquiry and details provided by a resident prior to the Director of Social Work's inappropriate and late arrival to the meeting[,]" (*id.*, ¶ 72); (9) that "[t]he Director of Social Work failed to ascertain the details of the resident's inquiry and . . . herself provided incorrect information to the resident[,]" (*id.*); (10) that "Benden was fully informed of . . . the Director of Social Work's unprofessional behavior, lack of understanding of context, and incorrectness of conclusion[,]" (*id.*); (11) that plaintiff "was rarely given the opportunity to perform social work intern tasks . . . and performed all tasks, though most of them menial, effectively[,]" (*id.*, ¶ 73); (12) that "Benden communicated his expectations to [plaintiff] only twice, once at the beginning of each semester," (*id.*); and (13) that the comments attributed to her by Benden as demonstrating "her lack of interest and a sense of hostility toward her field placement" were "pure fiction." (*Id.*, ¶ 74).

In addition, plaintiff alleges that in order "to support his false contentions [in the letter], Benden supplied Brodlieb with misleadingly incomplete samples of [plaintiff's] work, which made it appear as if [her] work was inadequate[,]" (Am. Compl., ¶ 75); and "represented that the

16

samples were complete when he supplied them, though he knew that they were incomplete, and willfully and maliciously did so . . . in order to cast [plaintiff] in an untrue and negative light, with intent to injure and damage [her] good name and reputation as a student, intern, and future social worker, and . . . to encourage her expulsion from the . . . [P]rogram."  (*Id.*)

On or about March 11, 2014, LIU expelled plaintiff from the Program without ever "attempt[ing] to ascertain [her] version of events or conduct[ing] a meaningful investigation of the matter[.]" (Am. Compl., ¶ 77).

Plaintiff alleges, *inter alia*, (1) that she "was denied reasonable accommodations by all defendants relating to certain disabilities which she had as a result of two automobile accidents," (Am. Compl., ¶ 4); (2) that "she was subject [sic] to a hostile work environment at [Bayview], consisting of pervasive disability-based and criminal history-based insults from Benden while interning[,]" (*id.*); (3) that LIU and Brodlieb breached their contract with, and fiduciary duty to, her, and "behaved discriminatorily [sic] in refusing to support [her] or assist in any resolution" after she made them "fully aware . . . of Benden's discriminatory treatment[,]"  (*id.*; *see also id.*, ¶¶ 57-59); (4) that "[i]mmediately after [she] wrote a report to Benden and LIU which disclosed improper quality of patient care at [Bayview], Benden retaliatorily [sic] and discriminatorily [sic] terminated [her] from the internship, wrote a defamatory letter regarding her to LIU, and provided false records of [her] work to LIU[,]" (*id.*, ¶ 5); and (5) that LIU "then retaliatorily [sic] and discriminatorily [sic] expelled [her] from its Masters of Social Work Program the very next day, . . . performing little to no investigation of the matter and failing to inquire as to [her] version of events at all."  (*Id.*)

Plaintiff "appealed her expulsion to Nathanson, who upheld the decision, . . . by letter

17

dated March 24, 2014." (Am. Compl., ¶ 78; LIU Ans, ¶ 78).  On a subsequent appeal "to a panel drawn from Nathanson's social work department[,] . . . the panel upheld the decision to expel her." (*Id.*, ¶ 79).

"While pursuing the appeal, [plaintiff] was permitted, per LIU's rules, to continue her classroom studies in the Program, and she did so." (*Id.*, ¶ 80).  According to plaintiff, "[t]he breaching [sic] and discriminatory treatment continued however, as [she] received a failing grade on a paper for allegedly failing to properly follow protocol, though [she] had followed the school syllabus in precisely the same manner as she had done previously without issue[,]" (*id.*); and she "received a 'C' and a 'C-' on two other papers . . . from Nathanson[,] . . . [when] [she] had earned a 3.33 GPA until that point." (*Id.*)  According to plaintiff, "it is necessary for a student in LIU's social work program to maintain a 3.0 GPA in order to remain matriculated[,]" (*id.*); and her "protestations regarding discriminatory grading were ignored." (*Id.*)  Plaintiff alleges that "[t]he stress of the breaching [sic] and discriminatory treatment forced [her] to take a mid-semester leave of absence from the [P]rogram during the spring, 2014 semester, pending the outcome of the appeal[,] [but] LIU refused to return the semester's tuition." (*Id.*, ¶ 81).

Plaintiff appealed her dismissal from the Program "to a panel composed of faculty drawn from outside of the social work department[,]" (Am. Compl., ¶ 82), which reversed the decision to expel her and reinstated her into the Program. (*Id.*; LIU Ans., ¶ 82).  Nonetheless, plaintiff alleges that she "lost a semester of study, work and tuition during th[e] process[;] . . . any possible graduation was delayed by a year[,]" (Am. Compl., ¶ 5; *see also id.*, ¶¶ 82-83); and she "suffered a great deal of emotional trauma." (*Id.*, ¶ 82).

Plaintiff alleges that after her reinstatement, "Nathanson emailed the Dean of LIU's

School of Health Professions and others in the social work department, and intimated that she did not want [plaintiff] to 'continue in the program,' while expressing the fear that taking such a stance could 'open us up to another legal conflict.'" (Am. Compl., ¶ 84).  Although plaintiff continued her studies in the Program, "many small acts of discrimination, retaliation, and breach of contract and fiduciary duty[]" occurred, (*id.*, ¶ 85), including: (1) one occasion when she "was marked 'late' for class, though entering the classroom at the stroke of starting time, and immediately behind a fellow student who was not so marked[,]" (*id.*); (2) one occasion when she "was the only student who was reprimanded for viewing her cell phone's screen during class, although she was viewing the class textbook on the phone screen at the time, and . . . several other students were doing likewise at the same moment[,]" (*id.*, ¶ 86); and (3) special restrictions being placed on her next internship, *e.g.*, "instructing her to start two weeks after all other students, which made it very difficult to timely complete all required hours[] [a]nd . . . provid[ing] [her] with a special letter providing that she was not permitted to take time off from the internship during spring break."  (*Id.*, ¶ 87).

On or about November 10, 2014, plaintiff filed separate charges with the United States Equal Employment Opportunity Commission ("EEOC") against the Bayview defendants and LIU alleging violations of the ADA and the Rehabilitation Act, which were purportedly served upon the Bayview defendants and LIU "in approximately late February, 2015."  (Am. Compl., ¶ 6). According to plaintiff, "up until that point," she had amassed a grade point average ("GPA") of 3.33, but "immediately after LIU received the EEOC complaint, and at the first moment possible after reinstatement to LIU, [she] began to receive very poor grades from the social work departments, grades so low that, per social work department policy, her expulsion from LIU was

mandated at the end of the Spring, 2015 semester."  (*Id.*; *see also id.*, ¶ 88 ["[I]n the Spring, 2015

semester, . . . at the explicit or implicit request of Nathanson, [plaintiff's] teachers began to give

her a series of very poor grades on all assignments which could be graded subjectively."]).

According to plaintiff, "[o]n the one test which [she] took which must have been graded

objectively (a multiple choice/fill in the blank test), [she] received a 90 out of 100, and [her]

evaluations from her current internship, (prepared by non-LIU personnel, . . .), were excellent."

(*Id.*, ¶ 88).

Plaintiff alleges that "[p]er the social work school's policy, any student who received

final class grades below B- in any three semester-long classes during the student's time at LIU is

expelled[,]" (Am. Compl., ¶ 89), and she had received one (1) such grade from Nathanson in a

prior semester.  (*Id.*)  According to plaintiff, "one of the teachers in the Spring of 2015 who gave

[her] a poor grade mentioned to [her] that she knew of th[e] old grade, indicating that she knew

of the consequences of two more such grades."  (*Id.*).

After plaintiff received final grades of a "C" and a "C+" in the Spring 2015 semester, she

was expelled from LIU by letter dated May 13, 2015.  (Am. Compl., ¶¶ 6, 89).


B.      Procedural History

Plaintiff received separate "Notice[s] of Right to Sue (Issued on Request)," both dated

"2/27/2014 [sic]," from the EEOC with respect to charges against the Bayview defendants and

LIU.  (Am. Compl., Ex. A).

On March 8, 2015, plaintiff commenced this action against defendants seeking damages

for, *inter alia*, defendants' alleged unjust enrichment, breach of contract, breach of fiduciary

duty, defamation, fraud, tortious interference with contract and violations of the FLSA, the NYLL, the ADA, the Rehabilitation Act, the NYSHRL, Article 23-A of the New York Corrections Law and Chapter XXI, Title C2 of the Nassau County Code.  On July 6, 2015, plaintiff filed an amended complaint against defendant asserting the following claims: (1) that defendants violated the FLSA, 29 U.S.C. § 206, and the NYLL, by willfully failing to pay her the federally-mandated and New York State minimum wage for the hours she worked at South Point and failing to keep records of her work (First and Second Causes of Action, respectively, against all defendants), (Am. Compl., ¶¶ 90-100); (2) that defendants violated Section 195 of the NYLL by willfully failing to provide her "with notice regarding her regular hourly rate of pay, overtime rate, pay day, method of pay calculation, name and address of employer and other information, and . . . [to] request [that she] . . . provide written confirmation of receipt of such notice" (Third Cause of Action against all defendants), (*id.*, ¶¶ 101-103); (3) that defendants knew of her disabilities, and perceived her as disabled, and willfully discriminated against her in violation of the ADA, the Rehabilitation Act, the NYSHRL and the Nassau County Code (Fourth and Fifth Causes of Action against South Point and the LIU defendants; Sixth Cause of Action against all defendants; and Seventh Cause of Action against the LIU defendants, respectively),[4] (*id.*, ¶¶ 104-127); (4) that defendants knew of her criminal history and that she had been issued a Certificate of Good Conduct in relation to her criminal history, and willfully discriminated against her in violation of the NYSHRL and the New York Correction Law (Eighth Cause of Action against all defendants), (*id.*, ¶¶ 128-132); (4) that all defendants terminated her from her internship at South

---

[4]  By order dated September 16, 2015, *inter alia*, plaintiff's fourth and fifth causes of action were dismissed as against Benden, and her seventh cause of action was dismissed as against the Bayview defendants. (DE 22).

Point, and the LIU defendants expelled her from the Program, in willful retaliation for her disclosure in the February 28, 2014 process recording of an activity that constituted improper quality of patient care at South Point in violation of Section 741 of the NYLL (Ninth Cause of Action against all defendants), (*id.*, ¶¶ 133-135); (5) that defendants breached their fiduciary duty to plaintiff "to act in her best interest and not engage in conduct adverse or detrimental to her," (Twelfth Cause of Action against LIU and Thirteenth Cause of Action against the Bayview defendants), (*id.*, ¶¶ 151-161); (6) that defendants were unjustly enriched by her internship at South Point insofar as, (a) the LIU defendants benefitted therefrom, at her expense, "by allowing such participation to be used to fulfill accreditation requirements, thereby receiving continued accreditation from the Commission on Accreditation of the Council on Social Work Education, which . . . in turn encouraged student to attend LIU and pay tuition there[,]" (*id.*, ¶ 164), and failing to "compensate her . . . in course credit[,]" (*id.*, ¶ 163), and (b) the Bayview defendants benefitted therefrom, at her expense, by having her perform "educationally-useless tasks . . . , which otherwise would have had to be performed by a paid employee," (*id.*, ¶ 165), and failing to compensate her in wages (Fourteenth Cause of Action against all defendants), (*id.*, ¶¶ 162-167); (7) that the Bayview defendants "libeled" plaintiff, "caus[ing] and contribut[ing] to [her] expulsion from LIU," (*id.*, ¶¶ 168-169), and "disparaged [her] in her profession[,] . . . constitut[ing] slander per se[,]" (*id.*, ¶ 170) (Fifteenth Cause of Action against the Bayview Defendants); and (8) that the Bayview defendants "committed fraud against [her] by knowingly submitting false samples of her work to Brodlieb and LIU and representing that such samples accurately reflected [her] work[,]" (*id.*, ¶ 172), knowing that the LIU defendants "would view these work samples unfavorably and use them to evaluate [her], and intend[ing] same[,]" (*id.*,

¶173), thereby "caus[ing] and contribut[ing] to [her] expulsion from LIU[,]" (*id.*, ¶ 175) (Sixteenth Cause of Action against the Bayview defendants).

In addition, plaintiff alleges, (1) that LIU's "promises and obligations to its students, including [plaintiff]," contained in its "website, [MSW] Degree Program Student Handbook, [MSW] Program Field Instruction Manual, and field contract, . . . among other documents and promises, . . . [which] incorporated by reference the publication and codes of ethics of the Council of Social Work Education and National Association of Social Workers[,]" (Am. Compl., ¶ 136), constituted a contract requiring LIU "to, *inter alia*, place [plaintiff] at an educationally-useful internship, properly vet South Point as an internship facility, perform a site evaluation at South Point, properly monitor South Point to ensure its compliance with internship requirements, properly respond to [plaintiff's] complaints in regard to the South Point internship, properly investigate Benden's complaints regarding [plaintiff], ensure that the internship provided 1 ½ hours of supervision per week, provide a field orientation, ensure skill development at South Point, not place [plaintiff] in an unsafe environment, provide [plaintiff] with internship clients, ensure the provision of competent internship staff with sufficient time to train [her], provide internship practice opportunities, refrain from discriminating against [her] in any way, recognize and accept diverse backgrounds and points of view, treat [her] fairly, compassionately and with care, integrity and justice, consistent with the highest ethical standards, refrain from allowing personal animosity to affect judgment and actions in regard to [her], make every effort to facilitate [her] professional development, adhere to promised teacher/student ratios, follow the procedures denoted in its publication, and provide the assistance denoted in its publications[,]" (*id.*, ¶ 138); and (2) that LIU breached its contract with plaintiff by failing to "provide that which

23

it promised to [her]" (Tenth Cause of Action against LIU).  (*Id.*, ¶¶ 136-141).

Moreover, plaintiff alleges that the Bayview defendants tortiously interfered with the contract between LIU and plaintiff by "knowingly," "willfully" and "maliciously" providing false information and documents to the LIU defendants, causing and contributing to LIU's breach of its contract with plaintiff (Seventeenth Cause of Action against the Bayview defendants).  (Am. Compl., ¶¶ 177-181).

Plaintiff further alleges, *inter alia*, (1) that the Bayview defendants established a contract with plaintiff by employing her, acted as agents of LIU and were, therefore, subject to the contract between LIU and plaintiff, and/or were contractually obligated to plaintiff by the Field Contract; (2) that pursuant to their contract with plaintiff, the Bayview defendants were required, *inter alia*, (a) to "provide [her] with an educationally-useful internship, . . . 1 ½ hours of supervision per week, . . . learning and practice opportunities to prepare her for social work practice, . . . skill-development opportunities, . . . [and] competent staff with sufficient time to train and guide [her]," (Am. Compl., ¶ 147), (b) to timely provide her with clients, (c) to "refrain from providing [her] with non-educational duties, . . . from discriminating against [her] in any way, . . . [and] from allowing personal animosity to affect judgment and actions in regard to [her]," (*id.*), (d) to "recognize and accept diverse backgrounds and points of view," (*id.*), (e) to "treat [her] fairly, compassionately and with care, integrity and justice, consistent with the highest ethical standards[,]" (*id.*), and (f) to make every effort to facilitate [her] professional development, [and] follow the procedures . . . and provide the assistance denoted in LIU's publications[,]" (*id.*); and (3) that the Bayview defendants breached their contact with plaintiff by failing to "provide that which they promised to [her]" (Eleventh Cause of Action against the

Bayview defendants).  (Am. Compl., ¶¶ 142-150).

Plaintiff seeks, *inter alia*, (1) unpaid minimum wages, liquidated damages and/or

statutory damages, together with reasonable attorney's fees, costs, expenses, and interest on her

FLSA and NYLL claims; (2) (a) reimbursement of her tuition, with interest thereon, (b) damages

to compensate her (i) for the time, effort and money she spent working, studying and fighting her

"expulsion;" (ii) for "lost future wages;" and (iii) for "severe emotional distress," (c) reasonable

attorney's fees, and (d) punitive damages on her ADA, Rehabilitation Act, NYSHRL, Nassau

County Code, Correction Law and Section 741 of the NYLL claims; (3) "compensatory,

consequential and punitive damages for loss of tuition, loss of income, loss of time, lost future

wages, waste of time, energy and work, pain and mental anguish, expense, inconvenience and

trouble" on her breach of contract, breach of fiduciary duty, defamation, fraud and tortious

interference with contract claims; and (4) compensatory damages and interest on her unjust

enrichment claim.  (Am. Compl. at 45-47).

Defendants now move, *inter alia*, for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure.


III.    Discussion

A.    Standard of Review

In deciding a Rule 12(c) motion, the same standard as applicable to a motion to dismiss

under Rule 12(b)(6) is employed.  *See Alcantara v. Bakery & Confectionery Union & Indus. Int'l

Pension Fund Pension Plan*, 751 F.3d 71, 75 (2d Cir. 2014); *Hogan v. Fischer*, 738 F.3d 509,

514-15 (2d Cir. 2013). The standard of review on a motion made pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S. Ct.

1937.  "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.*; *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-1 (2d Cir. 2010); *accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 729-30 (2d Cir. 2013).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 715, 190 L. Ed. 2d 441 (2014).  As the complaint relies heavily upon, *inter alia*, the Field Contract, (*see* Am. Compl., ¶¶ 50-53), and the Field Instruction Manual, (*see id.*, ¶¶ 26, 28-29, 31-33, 45-47, 58-59, 60-62), those documents are integral to the complaint and properly considered on defendants' motions for judgment on the pleadings.  All other extrinsic evidence submitted by the parties' in support of, and in response to, defendants' motions have not been considered by the Court.

27

B.      FLSA and NYLL Claims

"The strictures of both the FLSA and NYLL apply only to employees." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534 (2d Cir. 2015). With exceptions not relevant here, the FLSA defines the term "employee" to mean "any individual employed by an employer." 29 U.S.C. § 203(e). The NYLL similarly defines the term "employee" as "any individual employed or permitted to work by an employer in any occupation[.]" N.Y. Labor Law § 651(5). "Because the statutes define 'employee' in nearly identical terms, [courts] construe the NYLL definition as the same in substance as the definition in the FLSA." *Glatt*, 811 F.3d at 528.

In determining whether an unpaid intern is an employee entitled to compensation under the FLSA and NYLL, "the proper question is whether the intern or the employer is the primary beneficiary of the relationship." *Glatt*, 811 F.3d at 536. This "primary beneficiary test has three salient features[:] First it focuses on what the intern receives in exchange for his work[;] [s]econd, it . . . accords courts the flexibility to examine the economic reality as it exists between the intern and the employer[;] . . . [and] [t]hird, it acknowledges that the intern-employer relationship should not be analyzed in the same manner as the standard employer-employee relationship because the intern enters into the relationship with the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment . . . ." *Id.* (citations omitted).

In determining whether an unpaid intern is an employee under *Glatt*'s "primary beneficiary test," courts should consider the following factors:

> "1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship."

*Glatt*, 811 F.3d at 536-537.  In considering those "non-exhaustive" factors, a court must "weigh[] and balanc[e] all of the circumstances[,]" *id.* at 537, and "may consider relevant evidence beyond the specified factors in appropriate cases."  *Id.*  "No one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee [within the meaning of the FLSA and NYLL]."  *Id.*  Since "the touchstone of [the primary beneficiary] analysis is the 'economic reality' of the relationship, . . . a court may elect . . . to consider evidence about an internship program as a whole rather than the experience of a specific intern."  *Id.*  "[T]he question of an intern's employment status is a highly context-specific inquiry."  *Id.* at 539.

Defendants contend, *inter alia*, that the balance of factors under the primary beneficiary test weigh in favor of finding that plaintiff was not their employee.  Plaintiff contends, in essence, *inter alia*, that it is premature to apply the primary beneficiary test on a motion to

dismiss at the pleadings stage.

It is undisputed that plaintiff had no expectation of compensation from her internship at South Point and that the internship was conducted without entitlement to a paid job at South Point upon its conclusion.  (*See* Am. Compl., ¶¶ 2, 18, 25, 49).  Moreover, it is clear from the allegations in plaintiff's amended complaint that plaintiff's internship at South Point corresponded to LIU's academic calendar, *i.e.*, LIU's Fall 2013 and Spring 2014 semesters.  (*See, e.g. id.*, ¶ 2 ["At all relevant times [p]laintiff . . . was a student in the [MSW] Program at defendant LIU and, as part of the program, performed an internship, . . . at South Point . . . during the fall, 2013 semester and part of the spring, 2014 semester."];  ¶ 49 ["[Plaintiff] worked for approximately 16 hours per week for South Point from September through mid-December of 2013 and approximately 17 hours per week from mid-January to her termination [from the MSW Program by LIU] on or about March 10, 2014 . . . ."]).  Accordingly, the first, fourth and seventh factors weigh in favor of finding that plaintiff was not an "employee" for purposes of the FLSA and NYLL.[5]

Furthermore, LIU required plaintiff, *inter alia*, to take a "field work class" concurrently with her internship, to complete assigned tasks, and to create reports or "process recordings" about her internship experience.[6]  (*See* Am. Compl., ¶¶ 66-67; Field Contract at 1 and 3).  Thus,

---

[5]  In addition, the Field Instruction Manual expressly discourages students "from utilizing their places of employment for field internships" and provides certain criteria that must be met in any case "where the employment site is requested for approval as a practicum site."  (Murphy Aff., Ex. E at 10).

[6]  Pursuant to the Field Instruction Manual, "[s]tudents are required to submit a minimum of . . . three process recordings per week in the second year of the program."  (Murphy Aff., Ex. E at 26) (emphasis omitted).

plaintiff's internship at South Point was closely integrated with her curriculum in the Program at LIU.  In addition, just a few weeks before she was dismissed from the MSW Program, plaintiff had participated in a group meeting with the residents at South Point, (*see* Am. Compl., ¶ 67), thus indicating that her internship at South Point did not extend beyond the period in which she received beneficial learning.  Accordingly, the third and fifth factors also weigh in favor of finding that plaintiff was not an "employee" for purposes of the FLSA and NYLL.

Plaintiff's claims that she received "very little," "few" or "nearly no" educational benefit or training from the internship at South Point, and that she performed "primarily" secretarial and receptionist duties and "grunt work" at South Point, (Am. Compl., ¶¶ 2, 39, 49), do not warrant finding that she was an employee under the FLSA and NYLL.  *See, e.g. Vlad-Berindan v. NYC Metro. Transp. Auth.*, No. 14-cv-10304, 2016 WL 1317700, at * 8 (S.D.N.Y. Apr. 1, 2016) (finding that the plaintiff's allegations, *inter alia*, that she "'did not learn anything during the internship,' did not alter the conclusion that the plaintiff was the primary beneficiary of the internship and, therefore, would not be an 'employee' for purposes of the FLSA. . . .")  Indeed, in light of, *inter alia*, the above-quoted qualifying language in the amended complaint, and the fact that plaintiff was assigned at least one client and one group assignment, (*see* Am. Compl., ¶ 53), and was required to create reports or "process recordings" about her internship experience, (*see,* Am. Compl., ¶ 67; Field Contract at 1 and 3), it is clear that plaintiff received at least some educational benefit and training from the internship at South Point.  In any event, the fact that plaintiff would have received academic credit toward her MSW degree had she successfully completed the internship at South Point weighs in favor of finding that she was the primary beneficiary of the internship at South Point.  *See, e.g. Vlad-Berindan*, 2016 WL 1317700, at * 8

("It is unfortunate, if true, that Plaintiff learned nothing during her internship but even if that is true, it does not erase the fact that she received credit toward her degree by virtue of the internship . . . [and] was the primary beneficiary of the internship . . . .")

Moreover, the mere fact that the Bayview defendants may have obtained some "perks" or benefits from offering unpaid internships to LIU's students[7], and that LIU preserved its accredited status by placing its students in internships, "cannot, standing alone, render the student interns 'employees' for purposes of the FLSA." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1211 (11th Cir. 2015). So long "as the relationship at issue has the qualities of a bona fide internship, providing educational or vocational benefits in a real-world setting, the intern can be the primary beneficiary of the relationship even if her activities provide direct benefit to the employer." *Mark v. Gawker Media LLC*, No. 13-cv-4347, 2016 WL 1271064, at * 8 (S.D.N.Y. Mar. 29, 2016). Where an internship benefits both the intern and the employer, courts should "focus on the benefits to the student while still considering whether the manner in which the employer implements the internship program takes unfair advantage of or is otherwise abusive towards the student." *Id.* at 12 (quoting *Schumann*, 803 F.3d at 1211). Based upon the factual allegations in the amended complaint, plaintiff's internship at South Point was a bona fide internship in which she received educational and vocational benefits in a real-world setting in

---

[7] Pursuant to the Field Instruction Manual, the following incentives are offered to field sites and instructors supervising LIU's students: (a) the field site receives tuition remission, awarded as one and a half (1.5) credits for each second-year student who interns for one (1) year that may be allocated to any of its employees for any course at LIU for up to one (1) year from the date of issuance; (b) "[a]ctive field instructors are given a courtesy card which allows them to use the University Library and to obtain discounted tickets for selected events at the Tilles Center located on the LIU Post Campus[;]" and (c) field instructors "are invited to various symposia, networking events and workshops provided by the social work department on the . . . [LIU] campuses." (Murphy Aff., Ex. E at 28-29).

32

exchange for her work, which outweighed any of the benefits defendants may have received from the internship.

In sum, any factors arguably supporting a finding that plaintiff was an employee under the FLSA and NYLL are outweighed by the clear economic reality of her relationship with defendants, particularly since the undisputed purpose of her internship at South Point was to fulfill an academic requirement for her MSW degree.  (*See* Am. Compl., ¶ 25).  *See, e.g. Vlad-Berindan*, 2016 WL 1317700, at * 8 (finding that the plaintiff "was clearly the primary beneficiary of the internship with the [d]efendants[]" because, *inter alia*, she initially sought the internship because of an academic requirement).

The case cited by plaintiff, *Winfield v. Babylon Beauty Sch. of Smithtown Inc.*, 89 F. Supp. 3d 556 (E.D.N.Y. 2015), in support of her FLSA and NYLL claims against the LIU defendants is inapposite because, *inter alia*, the plaintiffs in that case were students in vocational schools who received academic credit for the work they performed in the schools' clinics, which included "manual labor and administrative functions as well as services in other fields of cosmetology that were unrelated to the field for which they sought a license."  *Id.* at 567.  The plaintiffs alleged, *inter alia*, that "as a result of the revenue generated from [their] work in the clinic, the [schools] allegedly earned a substantial profit and had a competitive advantage over for-profit salons, which are required to pay their employees a minimum wage."  *Id.*  The Court found that "[u]nder the circumstances, . . . it would be plausible to conclude that the primary benefit of the [p]laintiffs' work ran to the [schools], and therefore, they [were] employers subject to the minimum wage requirements of the FLSA."  *Id.*

Unlike the plaintiffs in *Winfield*, the work plaintiff performed for her internship was

performed at South Point, not an LIU clinic, and plaintiff does not allege that the LIU defendants received any direct profit, benefit or competitive advantage as a result of the work she performed at South Point.  Rather, plaintiff alleges only that LIU's "internship program is a requirement for school accreditation," (Am. Compl., ¶ 26; *see also id.*, ¶ 30), and that the LIU defendants "benefited [sic] from [her] participation in the internship program . . . by allowing such participation to be used to fulfill accreditation requirements."  (*Id.*, ¶ 164).  Since plaintiff does not allege that the LIU defendants received any direct benefit or competitive advantage from the work she performed at South Point, whereas she received educational and vocational training in a real-world setting and would have received academic credits required for her degree had she successfully completed the internship requirements, it is clear that plaintiff was the primary beneficiary of the internship at South Point.

Upon consideration of all of the *Glatt* factors, the totality of the circumstances as alleged in the amended complaint and the economic reality of the relationship between plaintiff and defendants, it is clear that plaintiff was the primary beneficiary of her internship at South Point with respect to her relationship with both the Bayview defendants and the LIU defendants.[8] Accordingly, the branches of defendants' motions seeking judgment on the pleadings with respect to plaintiff's FLSA and NYLL claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure are granted and plaintiff's FLSA and NYLL claims (First, Second and Third Causes of Action) are dismissed in their entirety with prejudice for failure to state a plausible claim for relief.

---

[8] Since neither the Bayview defendants, nor the LIU defendants, were plaintiff's employer for purposes of her FLSA and NYLL claims, or, as set forth below, for purposes of her ADA and Rehabilitation Act claims, it is unnecessary to consider plaintiff's alternative contentions regarding an agency relationship between them.

34

C.      Federal Discrimination Claims

1.      ADA and Rehabilitation Act Employment Discrimination Claims

An individual is not an "employee" within the meaning of Title I of the ADA and the

Rehabilitation Act, and cannot state a plausible claim for employment discrimination under those

statutes, in "the absence of either direct or indirect economic remuneration or the promise

thereof." *O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir. 1997)[9]; *see also Pastor v. Partnership*

*for Children's Rights*, No. 10-cv-5167, 2012 WL 4503415, at * 1 (E.D.N.Y. Sept. 28, 2012),

*aff'd*, 538 F. App'x 119 (2d Cir. Nov. 5, 2013) ("[I]nterns constitute employees under . . . the

ADA only if they receive some kind of direct or indirect financial benefit or promise thereof

from an employer.") "Th[e] remuneration need not be a salary, . . . but must consist of substantial

benefits not merely incidental to the activity performed[.]" *United States v. City of New York*,

359 F.3d 83, 92 (2d Cir. 2004) (quotations and citations omitted); *see also York v. Ass'n of Bar*

*of City of New York*, 286 F.3d 122, 126 (2d Cir. 2002) (holding that the following facts are

"indicative of 'financial benefit': salary or other wages; employee benefits, such as health

insurance; vacation; sick pay; or the promise of any of the foregoing[,]" and that "benefits must

meet a minimum level of 'significance,' or substantiality, in order to find an employment

_____

[9]   Although *O'Connor* involved claims under Title VII, "the definition of 'employee' under the ADA parallels that under Title VII and was intended to be given the 'same meaning.'" *Castellano v. City of New York*, 142 F.3d 58, 69 (2d Cir. 1998); *accord Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n. 2 (2d Cir. 2000).  Similarly, the same standards applied to ADA claims are applicable to employment discrimination claims brought under the Rehabilitation Act.  *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 n. 2 (2d Cir. 2003) (finding that cases interpreting the ADA are relevant to employment discrimination claims under the Rehabilitation Act "because the Rehabilitation Act provides that '[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the [ADA] . . . as such sections relate to employment.'" (quoting 29 U.S.C. § 794(d)).

relationship in the absence of more traditional compensation.")  "Financial benefits might be in the form of a salary or wages, or benefits such as medical insurance, retirement pensions, life or disability insurance, vacation time, sick pay, and/or a promise of any of the above." *Pastor*, 2012 WL 4503415, at *1; *see also York*, 286 F.3d at 126 (holding that financial benefits sufficient to satisfy the "remuneration test" are those "which primarily benefit the employee independently of the employer, such as "salary, vacation, sick pay, . . . health insurance, disability insurance, life insurance, death benefits, and retirement pension[.]")  Since plaintiff did not receive any such compensation or benefits from either the Bayview defendants or the LIU defendants, (*see*, Am. Compl., ¶¶ 2, 18, 25), she cannot state a plausible claim for employment discrimination, or a hostile work environment, under either the ADA or the Rehabilitation Act against them. Accordingly, the branch of the Bayview defendants' motion seeking judgment on the pleadings with respect to plaintiff's claims under the ADA and Rehabilitation Act pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted to the extent that plaintiff's employment discrimination claims under Title I of the ADA and the Rehabilitation Act (Fourth and Fifth Causes of Action, respectively) are dismissed in their entirety with prejudice for failure to state a claim for relief.[10]

### 2.    Other Discrimination Claims under the ADA

However, claims under the Rehabilitation Act and the ADA are not limited to employment discrimination claims.  *See, e.g.* 29 U.S.C. § 794(a); 42 U.S.C. §§ 12132, 12182 and

---

[10]  In light of this determination, it is unnecessary to consider the LIU defendants' remaining contentions seeking dismissal of plaintiff's employment discrimination claims under the ADA and Rehabilitation Act.

12189.

a.    Title II of the ADA

Title II of the ADA provides:

> "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities *of a public entity*, or be subjected to discrimination *by any such entity*."

42 U.S.C. § 12132 (emphasis added). To the extent the amended complaint can be read to assert a claim under Title II of the ADA, such claim cannot be asserted against any of the defendants, as none of them is a "public entity" within the meaning of the statute.  *See* 42 U.S.C. § 12131(1) (defining the term "public entity" to mean "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, an any commuter authority (as defined in section 24102(4) of Title 49).") Rather, South Point is alleged to be "a domestic limited liability company organized under the laws of the State of New York . . . in the nursing home and rehabilitation facility business . . . [and] a recipient of federal financial assistance[,]" (Am. Compl., ¶ 21); and LIU is alleged to be "a domestic not-for-profit corporation organized under the laws of the State of New York . . . in the business of higher education . . . [and] a recipient of federal financial assistance."  (*Id.*, ¶ 24).  *See, e.g. Green v. City of New York*, 465 F.3d 65, 78-80 (2d Cir. 2006) (holding that a private hospital is not a "public entity" within the meaning of Title II of the ADA); *Spychalsky v. Sullivan*, No. 01-cv-0958, 2003 WL 22071602, at * 5 (E.D.N.Y. Aug. 29, 2003), *aff'd*, 96 F. App'x 790 (2d Cir. May 25, 2004) (dismissing the plaintiff's claims under Title II of the ADA against a division of a private catholic university on the basis that it is not a "public entity" within the meaning of the statute).  Accordingly, to the

37

extent that the fourth cause of action in the amended complaint can be read to assert a claim under Title II of the ADA, that claim is dismissed in its entirety with prejudice for failure to state a claim for relief.

b.      Title III of the ADA

To the extent the amended complaint can be read to assert a claim under Title III of the ADA, "[m]onetary relief . . . is not available to private individuals under Title III of the ADA." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 86 (2d Cir. 2004), *as corrected by* 511 F.3d 238 (2d Cir. 2004). "A private individual may only obtain injunctive relief for violations of a right granted under Title III [of the ADA]; [s]he cannot recover damages." *Powell*, 364 F.3d at 86; *see also Krist v. Kolombos Rest. Inc.* 688 F.3d 89, 94 (2d Cir. 2012) (holding that Title III of the ADA "authorizes private actions only for injunctive relief, not monetary damages[.]")

Since plaintiff seeks only monetary relief with respect to her ADA claims, *i.e.*, reimbursement of her tuition, compensatory and punitive damages and attorney's fees, the amended complaint fails to state a plausible claim for relief under Title III of the ADA. Accordingly, the branch of the LIU defendants' motion seeking judgment on the pleadings with respect to plaintiff's ADA claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted to the extent that any claim under Title III of the ADA (Fourth Cause of Action) is dismissed in its entirety with prejudice for failure to state a plausible claim for relief.

3.      Section 504 of the Rehabilitation Act Claim

Section 504 of the Rehabilitation Act provides, in relevant part:

38

> "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her . . . disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

29 U.S.C. § 794(a).  Thus, "[i]n order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must show: (1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was 'otherwise qualified' for the benefit that has been denied; (3) that he has been denied the benefits 'solely by reason' of his disability; and (4) that the benefit is part of a 'program or activity receiving Federal financial assistance.'" *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998); *see also Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) ("To state a prima face claim under [Section 504 of the Rehabilitation Act], a plaintiff must establish (1) that she is a qualified individual with a disability; (2) that she was excluded from participation in [or denied the benefits of] . . .  programs or activities [of an entity receiving federal financial assistance] or was otherwise discriminated against by . . . [such] entity; and (3) that such exclusion or discrimination was due to her disability."(quotations and citation omitted)).

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), specifically incorporates the definition of "individual with a disability" in 29 U.S.C. § 705(20), which provides, in relevant part, that for purposes of, *inter alia*, subchapter V of the Act, which includes Section 504, and subject to certain exclusions not relevant here, "individual with a disability" means "any person who has a disability as defined in section 12102 of Title 42."  "Disability" is defined in 42 U.S.C. § 12102 as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  Contrary to defendants' contentions,

39

plaintiff's allegations are sufficient, at the pleadings stage, to satisfy the first element of a claim under Section 504 of the Rehabilitation Act.

"A plaintiff may base her discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis*, 821 F.3d at 260.  Plaintiff bases her disability discrimination claim on the latter theory, *i.e.*, defendants' purported failure to provide her with reasonable accommodations.  (*See* Am. Compl., ¶¶ 4, 36, 55, 57, 63).  In considering such claims, courts "ask whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled." *Wright v. New York State Dep't of Corr.*, — F.3d —, 2016 WL 4056036, at * 4 (2d Cir. July 29, 2016) (quotations and citation omitted); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003) ("Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation.")

Even liberally read, the amended complaint does not state a plausible claim under Section 504 of the Rehabilitation Act because, *inter alia*, it may not reasonably be inferred from the factual allegations therein that plaintiff was denied meaningful access to services, programs or activities of defendants to which he or she was legally entitled by defendants' refusal to make reasonable accommodations, or that she was otherwise excluded from participating in, or denied the benefits of, any program or activity of South Point or LIU "*solely* by reason of her . . . disability."  29 U.S.C. § 794(a) (emphasis added); *see, e.g. Harris v. Mills*, 572 F.3d 66, 75 (2d Cir. 2009) (holding that the plaintiff's Rehabilitation Act claim was insufficient because, *inter alia*, there was "no allegation (beyond *ipse dixit*) that [he] was denied the opportunity to read

from a written statement 'by reason' of his disability, let alone 'solely by reason' of his disability, as the Rehabilitation Act requires."); *Flight v. Gloeckler*, 68 F.3d 61, 64 (2d Cir. 1995) (affirming the dismissal of the plaintiff's Rehabilitation Act claim on the basis, *inter alia*, that he was not denied a benefit "solely by reason of [] his disability" within the meaning of Section 504).

"In order to show that the [denial of benefits] was 'solely by reason of her or his disability,' the plaintiff must show (a) that there was a 'causal connection' between [her] disability and the . . . decision [to deny her benefits], . . . and (b) that the disability was the only cause of the decision[.]" *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994) (citations omitted); *see also Sinisgallo v. Town of Islip Housing Auth.*, 865 F. Supp.2d 307, 340 (E.D.N.Y. 2012) (holding that in order to establish the requisite causal connection with respect to plaintiff's reasonable accommodation claim under, *inter alia*, the Rehabilitation Act, the plaintiff must show that but for his disability, he would not have needed a reasonable accommodation to an otherwise neutral policy and, thus, he would not have been denied the benefit at issue, and that "[f]ramed this way, the onus of the reasonable accommodation analysis is not the defendants' purpose in terminating [the benefit], but whether [the plaintiff] was unable to comply with the defendants' neutral policy and [was denied the benefit] because of his disability." (quotations, alteration and citation omitted)). "If the [defendant] can show that its decision was motivated at least in part by a factor other than the plaintiff's disability, the Rehabilitation Act claim must be rejected." *Sedor*, 42 F.3d at 746. "The causal relationship between disability and decision need not be direct, in that causation may be established if the disability caused conduct that, in turn, motivated the [defendant] to [act] . . . ; however, to satisfy the 'solely' part of the 'solely by

41

reason of' element, the disability must have been the only cause of the . . . [defendant's] conduct." *Sedor*, 42 F.3d at 746.  "Thus, only if the only reason for the conduct was the disability could the [plaintiff] be said to have been [denied the benefits of a program or activity] '*solely'* by reason of his disability."  *Id.* (emphasis in original; quotations, alterations and citation omitted).

Nothing in the amended complaint indicates that plaintiff was denied meaningful access to any program or service at South Point or LIU by defendants' failure to make reasonable accommodations for her disability.  To the contrary, it is clear from the factual allegations in the amended complaint that plaintiff was "provide[d] the needed accommodations" no later than December 2013.  (Am. Compl., ¶ 63).

Furthermore, it may not reasonably be inferred from the factual allegations in the amended complaint (1) that the Bayview defendants requested that plaintiff's internship at South Point be terminated, or otherwise denied her of any benefit of the internship program, or (2) that the LIU defendants (a) expelled plaintiff from the MSW Program; (b) gave her a failing grade, and two (2) grades of "C" or below; (c) put "special restrictions" on her subsequent internship, (Am. Compl., ¶ 87); (d) gave "her a series of very poor grades on all assignments which could be graded subjectively" during the Spring 2015 semester, (*id.*, ¶ 88); or (e) otherwise denied her any benefit of the MSW Program solely because of her disability.  Rather, plaintiff alleges, *inter alia*, (1) that "[w]ithin days, if not hours, of reading the process recording" she submitted to Benden and LIU that "disclosed improper quality of patient care at South Point[,]" (Am. Compl., ¶¶ 67-68), Benden "published" the allegedly defamatory letter requesting that she "be removed from her placement at South Point[,]" (*id.*, ¶¶ 68-76; *see also id.*, ¶ 5 ["Immediately after [plaintiff]

wrote a report to Benden and LIU which disclosed improper quality of patient care at South Point, Benden retaliatorily [sic] and discriminatorily [sic] terminated [her] from the internship, wrote a defamatory letter regarding her to LIU and provided false records of [her] work to LIU"]); (2) that LIU expelled plaintiff from the MSW Program "the very next day" after receiving Benden's letter, without conducting an investigation, (*id.*, ¶ 77; *see also id*, ¶ 5 ["LIU, . . . then retaliatorily [sic] and discriminatorily [sic] expelled [her] from its [MSW] Program the very next day, . . . performing little to no investigation of the matter and failing to inquire as to [her] version of events at all"]); (3) that thereafter she received a failing grade and two (2) "bad" grades "[w]hile pursing the appeal" of her dismissal from the MSW Program, (*id.*, ¶ 80); (4) that after the decision to expel her was reversed on appeal and she was reinstated to the MSW Program, Nathanson "intimated [in an email] that she did not want [plaintiff] to 'continue in the program,'" (*id.*, ¶ 84; *see also id.*, ¶ 5 ["Nathanson expressed her frustration with the reinstatement decision, and communicated to the social work department that she wished [plaintiff] gone from the school"]); and (5) that LIU subsequently "put special restrictions on [her] next internship" and, "at the explicit or implicit request of Nathanson," gave plaintiff "a series of very poor grades on all assignments which could be graded subjectively," resulting in plaintiff being expelled from LIU in May 2015.  (*Id.*, ¶¶ 87-89).  Thus, based upon the allegations in the amended complaint, one of the causes, if not the primary cause, of the challenged conduct by defendants was plaintiff's submission of the process recording purportedly disclosing improper quality of patient care at South Point.  Accordingly, none of the challenged conduct was caused solely by reason of plaintiff's disabilities.

Similarly, to the extent that plaintiff bases her Rehabilitation Act claim on her claim that

43

LIU provided her with only one (1) choice for an internship, *i.e.*, South Point, (Am. Compl., ¶ 27), she attributes that decision to discrimination based upon her criminal history, not her disabilities. (*Id.*, ¶¶ 3, 35).

Since plaintiff's purported disabilities were clearly not the sole cause of the challenged decisions and conduct by defendants, plaintiff cannot state a plausible claim under Section 504 of the Rehabilitation Act against them as a matter of law. *See, e.g. Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 342-343 (E.D.N.Y. 2014) (dismissing the plaintiff's claims under Section 504 of the Rehabilitation Act because "[n]othing in the Complaint raise[d] the plausible inference . . . that she was given a failing grade solely because of her disability."); *Cain v. Mandl College of Allied Health*, No. 14-cv-1729, 2015 WL 3457143, at * 5 (S.D.N.Y. May 29, 2015) (dismissing the plaintiff's disability discrimination claims on the basis, *inter alia*, that there was no indication that her alleged disability had any bearing on her dismissal from the school). Accordingly, the branches of defendants' motions seeking judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure with respect to plaintiff's disability discrimination claim under Section 504 of the Rehabilitation Act are granted and plaintiff's claim under Section 504 of the Rehabilitation Act (Fifth Cause of Action) is dismissed in its entirety with prejudice for failure to state a plausible claim for relief.


D.    State Law Claims

Although the dismissal of state law claims is not required when the federal claims in an action are dismissed, *see Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 391-92, 118 S. Ct. 2047, 141 L. Ed. 2d 364 (1998), a federal court may decline to exercise supplemental jurisdiction

over the state law claims pursuant to 28 U.S.C. § 1367(c).  *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 129 S. Ct. 1862, 1866-1867, 173 L. Ed. 2d 843 (2009) (holding that a district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117 (2d Cir. 2013) ("The exercise of supplemental jurisdiction is within the sound discretion of the district court.")  The court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction" over any pendent state law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, n. 7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988); *accord Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014). Generally, where all of the federal claims in an action are dismissed before trial, or where a claim raises a novel or complex issue of state law, the balance of factors will favor declining to exercise supplemental jurisdiction over the remaining state law claims.  *See Cohill*, 484 U.S. at 350 n. 7; *Kroshnyi*, 771 F.3d at 102 ("A court may decline to exercise supplemental jurisdiction[] . . . if, among other factors the claim raises a novel or complex issue of State law, or [it] has dismissed all claims over which it has original jurisdiction." (quotations and citations omitted)); *Delaney v. Bank of America Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (quotations and citation omitted)).

        In light of the dismissal of all federal claims in this action at the pleadings stage, and the fact that plaintiff's NYSHRL claim raises a novel and unresolved issue of state law, *i.e.*, whether the amendment to the NYSHRL to add Section 296-c, effective July 22, 2014, is entitled to

45

retroactive effect, and upon consideration of all relevant factors, *i.e.*, judicial economy,

convenience, fairness and comity, I decline to exercise supplemental jurisdiction over the

remaining state law claims in this action.  Accordingly, plaintiff's remaining state law claims

(Sixth through Seventeenth Causes of Action) are dismissed without prejudice pursuant to 28

U.S.C. § 1367(c)(1) and (3).  Pursuant to 28 U.S.C. § 1367(d), the statute of limitations for any

state law claims timely filed in this Court is tolled for a period of **thirty (30) days after the date

of this order** unless a longer tolling period is otherwise provided under state law.


IV.  Conclusion

For the reasons set forth above, defendants' motions seeking judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure are granted to the extent that

plaintiff's claims alleging violations of the FLSA, the NYLL, the ADA and the Rehabilitation

Act (First through Fifth Causes of Action) are dismissed in their entirety with prejudice for

failure to state a claim for relief, and plaintiff's remaining state law claims (Sixth through

Seventeenth Causes of Action) are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c),

and the motions are otherwise denied.  The Clerk of the Court shall enter judgment in favor of

defendants and close this case.

**SO ORDERED.**

_____/s/_____
Sandra J. Feuerstein
United States District Judge


Dated:          August 19, 2016
                Central Islip, New York